IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUTH NIVAR,<br><br>*Defendant.* | Case No. 24-cr-222-1 (JEB) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant Ruth Nivar pled guilty to extorting some of the most vulnerable members of our society – low-income, non-English speaking immigrants in need of public assistance health care coverage for themselves and their families. While she was an employee of the District of Columbia ("D.C.") Department of Human Services ("DHS"), Nivar charged victims money to perform the very duties she was required to provide as part of her job: to help them apply for and receive health care coverage from the D.C. government. Nivar was able to extort these individuals because she held a position of public trust, which she blatantly abused since at least 2018 to enrich herself, adding a co-conspirator in 2022 in an attempt to conceal her illegal activity. This was a serious criminal offense rooted in greed that willfully preyed on individuals most in need. The parties' pre-trial resolution and agreed-upon estimated guidelines range under the United States Sentencing Guidelines ("U.S.S.G.") already factors in Nivar's acceptance of responsibility and lack of scorable criminal history. To address the gravity of her offense and sufficiently deter other public servants from similar acts of corruption, the Court should impose a sentence of 27 months of incarceration.

1

I. **RELEVANT BACKGROUND**

A. **Nivar's Criminal Conduct**

i. **Defendant Nivar and the Relevant D.C. Programs**

Defendant Nivar was employed by DHS as a Social Services Representative ("SSR")[1] from July 2005 until June 2023 when she resigned.[2] ECF 60 ¶ 1. DHS administers programs that support low-income individuals and families. *Id.* ¶¶ 3-5. Nivar's job responsibilities included helping them complete and process applications for public assistance programs, including but not limited to D.C. Health Care Alliance, the Immigrant Children's Program, and Medicaid. *Id.* ¶¶ 3-6. Nivar has admitted that she was not permitted by DHS to charge or collect a personal fee to complete or process applications; it was part of her job responsibilities to do so free of charge. *Id.* ¶ 6. In addition, at least since Nivar became an SSR, the review and processing of all applications for all D.C. government public assistance benefits have been free for all applicants. *Id.* ¶ 7.

ii. **SSR Training**

The training and other materials Nivar received in her role as an SSR underscore that she knowingly and willfully used her official position to obtain money to which she had no right. For example, DHS provides caseworkers training as part of an orientation from the Board of Ethics and Government Accountability. The slides for the training cautioned employees to "[a]void gifts and payments from interested parties (also called bribery)."[3] The training also cautioned

---

[1] On October 1, 2022, Nivar began a one-year detail assignment to the D.C. Department of Health Care Finance, but maintained her position as an SSR.

[2] DHS put Nivar on administrative leave on May 17, 2023 – around the time when the Federal Bureau of Investigation executed a residential search warrant at her home. Instead of being terminated, however, Nivar asked to resign effective June 30, 2023.

[3] Board of Ethics and Government Accountability, New Employee Orientation (Nov. 24, 2015), Slide 10, *available at*

2

employees to "[a]void outside payment for government work," specifying that "[n]o one should pay you for your District work except the District," and warns that it's "[a]lso a Federal Criminal law with criminal penalties."[4]

### iii. Initiation of the Investigation

In late 2020, an SSR reported, based on a series of events, that Nivar was charging applicants a fee in exchange for processing public assistance benefits. The matter was referred to DHS and Office of Program Review Monitoring and Investigations ("OPRMI"). They reviewed DHS applications and discovered, for example, that the only SSR to have acted on one individual's application between 2017 to 2020 was Nivar, even though applications were supposed to be assigned for review to SSRs at random, making it extraordinarily unlikely that the same SSR would get the same applicant's application year after year. Given these allegations, the D.C. Office of the Inspector General, in conjunction with the Federal Bureau of Investigation ("FBI"), began investigating Nivar for charging individuals applying for public benefits in exchange for processing their applications.

### iv. How Nivar Operated Solo

During the course of the Government's investigation, the FBI, *inter alia*, interviewed DHS employees and dozens of potential victims who had paid Nivar to obtain health coverage; collected financial records for Nivar and the individuals she extorted; combed through DHS records, particularly Nivar's activity processing and approving individuals' health care coverage applications; obtained text messages Nivar exchanged with the individuals; and reviewed Nivar's

---

https://bega.dc.gov/sites/bega/files/publication/attachments/New_Employee_Orientation_-_11.24.15_0.pdf (last visited Apr. 17, 2025).

[4] *Id.* at 11.

DHS and personal e-mail records. Nivar has admitted that at least since 2018, she charged applicants a fee to complete and / or process public assistance applications, even though she was obligated as part of her job duties not to charge such a fee. ECF 60 ¶¶ 8-9.

Nivar employed a few notable aspects in her scheme. First, she instructed individuals to send documentation to Nivar personally (as opposed to DHS) that she knew from her job responsibilities was necessary to process public assistance benefits. *Id.* ¶ 10. Indeed, Nivar used her personal Google e-mail to exchange messages with her DHS e-mail account regarding public assistance beneficiaries. Between November 2016 and December 2021, Nivar's official DHS e-mail account received at least 250 e-mails from her Google account that contained photographs of documents often necessary to process health care coverage from the D.C. government – such as driver's licenses, passports, social security cards, and utility bills – with significant drops in 2021 and 2022, around the time Nivar introduced co-conspirator Moya into the scheme. Second, as illustrated in the examples below, Nivar demanded that individuals pay her either via Zelle or in cash. Finally, DHS records revealed that Nivar, in fact, often would process and approve health care coverage for individuals who she had charged money, but other times, would collect payment even if the DHS system automatically renewed an individual's health care coverage.

### v. Introduction of Moya and Other Efforts to Conceal Scheme

At some point in 2022, after Nivar realized that law enforcement was aware of the scheme, she introduced into the enterprise Yessica Moya, a friend who was never employed by the D.C. government. ECF 60 ¶¶ 2,12. Moya understood that Nivar wanted to hide the scheme from law enforcement. ECF 57 ¶ 9. Accordingly, Nivar directed numerous individuals to communicate with Moya about the applications. ECF 60 ¶ 13. Using information Nivar acquired through her years working on public assistance programs for the D.C. government – including eligibility

requirements, information from the internal DHS database, and the necessary documentation – Moya would submit applications online. ECF 60 ¶¶ 17-18. Indeed, Nivar repeatedly used her position at DHS and access to nonpublic, sensitive information to enrich herself and Moya.

Nivar also told the applicants to pay Moya, after which Moya would split the proceeds with Nivar evenly. ECF 60 ¶ 13. Nivar charged individuals who she had assisted previously $150. *Id.* ¶ 14. After Moya joined the scheme, new applicants were charged $200, with most paying via Zelle. *Id.* Nivar also attempted to conceal the scheme by using an encrypted messaging application with Moya and with the individuals seeking health care coverage. *Id.* ¶ 19. Moya admitted that since 2022 when she joined the scheme, Nivar induced payment from at least 50 public assistance applicants to obtain benefits to which they were entitled to apply for free. ECF 57 ¶ 35.

### vi. Victims' Testimony and Other Evidence Underscoring Nivar's Affirmative Steps to Extort

Far from being a D.C. government employee who purports to have rationalized passively receiving "gratuities" from low income individuals, Nivar affirmatively took advantage of (*i.e.*, extorted) non-English speaking, vulnerable immigrants without the resources to apply for health care coverage on their own – even though it was Nivar's very duty to help these individuals navigate what can be an intimidating and complicated government process. For example:

- Person E, referenced both in Nivar's Statement of Offense and in the Indictment, testified in the grand jury that she tried to obtain health care coverage from the D.C. government because her husband needed emergency treatment related to cancer in September 2021. Person E visited several places in hopes of obtaining coverage, including the DHS Service Center at 645 H Street NE in Washington, D.C., only to find it closed. Outside was Nivar, who told Person E that "if you want me to help you, I can, but you have to pay me." According to Person E, Nivar "was charging that for the work she was going to do." Zelle records and Person E's testimony show that Nivar induced at least $900 from Person E, and that Nivar processed and approved Person E's and her husband's health care coverage from the D.C. government. Records also show that even though Person E paid Nivar in February 2022, the DHS system automatically renewed the coverage, meaning Nivar likely accepted payment for doing nothing.

- Person D, referenced both in Nivar's Statement of Offense and in the Indictment, testified in the grand jury that in 2019 or 2020, she was standing in line at a medical clinic in Washington, D.C. and received Nivar's telephone number from two unknown people. Person D called Nivar, who did not disclose her name and instead went by "Mrs. Zero," as saved in Person D's phone. Person D knew Nivar (Mrs. Zero) was "a person who worked in the medical insurance, where they give the medical insurance." Nivar told Person D that "I had to pay $150 for her to be able to renew the insurance." Person D understood that Nivar "was not going to renew the[] insurance" unless she paid her, and that there was no other option for keeping her coverage even though she was earning no income at the time. Records show that Nivar induced at least $300 from Person D. Person D told FBI agents she thought the money would be paid to the D.C. government and that Mrs. Zero was collecting it as part of her job. DHS records show that Nivar processed and approved Person D's and her son's health care coverage from the D.C. government.

- Person H, referenced both in Nivar's Statement of Offense and in the Indictment, testified in the grand jury that when she was 16 or 17 years old, a friend gave her Nivar's phone number so she could obtain coverage for dental care that she needed in 2022. Nivar told Person H she needed to pay her approximately $200 to $300, which Person H delivered in cash to Nivar's home. Person H's mom separately told the Government during an interview that she gave her daughter approximately $300 cash so she could obtain coverage to fix the dental issues. Person H – a minor – thought the payment "was going . . . to the government or where you get the insurance from." DHS records show that Nivar processed and approved Immigrant Children's Program coverage for Person H. In 2023, Nivar instructed Person H via WhatsApp messages to pay Moya $350 in exchange for processing health care coverage for Person H and her mom. Zelle records show that Person H paid Moya as Nivar demanded. Despite this, DHS records show that Nivar did not process health care coverage for Person H or her mom in 2023, meaning Nivar likely accepted payment for doing nothing.

**B. Procedural Background**

On May 9, 2024, Nivar was indicted on one count of Conspiracy to Commit Hobbs Act Extortion Under Color of Official Right and six counts of Hobbs Act Extortion Under Color of Official Right. Moya was also indicted on the conspiracy count and two of the substantive extortion counts. Trial was scheduled to commence on February 3, 2025. In December 2024 and January 2025, the Government prepared to present a superseding indictment to add extortion charges based on testimony and other evidence involving additional extortion victims. Co-defendant Yessica Moya cooperated with the Government against Nivar and was the first to accept and enter a guilty plea in this case on January 8, 2025. After learning of Moya's entry of a

6

cooperation plea, Nivar pled guilty on January 13, 2025 to Counts One and Two in the Indictment, charging her respectively with Conspiracy to Commit Hobbs Act Extortion Under Color of Official Right, in violation of 18 U.S.C. § 371, and Hobbs Act Extortion Under Color of Official Right, in violation of 18 U.S.C. §§ 1951(a) and 2.  Nivar's sentencing hearing is currently scheduled for April 25, 2025.  Moya is currently scheduled to be sentenced on June 6, 2025.

### C. Victim Impact Statement

Numerous victims spoke with law enforcement during the investigation of this case, provided critical evidence including text messages with Nivar (and Moya), and testified in the grand jury.  A number of the victims expressed feeling afraid of Nivar and the possibility of retribution by sharing their stories.  All of the contacted victims were apprehensive to participate in sentencing, choosing not to provide a victim impact statement.

## II. SENTENCING GUIDELINES

The Government, the Defendant, and the U.S. Probation Office have agreed upon a Guidelines range of 24 to 30 months of incarceration.  The applicable guidelines are:

| U.S.S.G. Section | Description | Levels |
|---|---|---|
| 2C1.1(a)(1) | Base Offense Level – Public Official | 14 |
| 2C.1.1(b)(1) | Specific Offense Characteristics – more than one extortion | +2 |
| 2C.1.1(b)(2), 2B1.1(b)(1) | Loss Amount: more than $6,500 and less than $15,000[5] | +2 |

---

[5] The parties agree that the loss amount attributable to Nivar's criminal conduct is at least $6,500. The Government informed the Defendant's counsel that in light of her pre-trial guilty plea, the Government would not take further investigative steps to determine the loss amount of payments made by numerous additional victims to Nivar, which potentially could have exceeded $15,000.

7

| | | |
|:---:|:---:|:---:|
| 3A1.1(b)(1) | Applicable Adjustment: Vulnerable Victim | +2 |
| 3E1.1 | Acceptance of Responsibility | -2 |
| 3E1.1(b) | Timely Notice of Acceptance | -1 |
| **TOTAL ADJUSTED OFFENSE LEVEL** | | **17** |

Regarding criminal history, according to the presentence report, the defendant has prior infractions for disorderly conduct, petit larceny, and traffic violations, but none are scorable. The plea agreement scored Nivar's 2008 Loudoun County conviction at one point, although U.S. Probation did not score this conviction. Upon review of U.S. Probation's analysis, the Government agrees that it should not be scored, leaving the defendant with zero criminal history points. PSR ¶ 62. This does not change Nivar's criminal history calculation, as she remains in Category I.[6] *Id.* With an offense score of 17 and a criminal history of Category I, the recommended guidelines range is 24 to 30 months of incarceration. PSR ¶ 132.

### III.    THE SECTION 3553(a) FACTORS SUPPORT A GUIDELINES SENTENCE

As the Court is well aware, after calculating the applicable Guidelines range, a sentencing court must then consider that range as well as the sentencing factors set forth in 18 U.S.C. § 3553(a) to determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to that section's enumerated factors, of particular relevance here are the nature and circumstances

---

[6] Because the Vulnerable Victim Adjustment pursuant to U.S.S.G. § 3A1.1(b)(1) applies, the Government agrees with the U.S. Probation Office that Nivar is *not* eligible for the Zero-Point Offender Adjustment pursuant to U.S.S.G. § 4C1.1(a)(9).

of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense and promote respect for the law; the need for the sentence to afford adequate deterrence; and the kinds of sentences available and need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. *See generally* 18 U.S.C. § 3553(a).  The inquiry is focused on fashioning a sentence that is "sufficient, but not greater than necessary" to advance the § 3553(a) factors, which in turn reflect the purposes of punishment.  *Id*.

### A. The Sentence Imposed Must Reflect the Nature and Circumstances of the Offense, and its Seriousness

This crime is serious by any measure.  Nivar preyed on impoverished, non-English speaking individuals who lacked the resources to navigate what can be the complicated process of obtaining health care coverage from the government.  For multiple years, Nivar abused a position of public trust to enrich herself and eventually her co-conspirator, Yessica Moya.  This was not a crime of necessity or goodwill.  It was a crime of greed, motivated by Nivar's desire to supplement her DHS salary – even though her job duties required her to help these individuals without charging a fee.  Even taking on its face Nivar's excuse that the individuals offered to pay her, which is belied by the evidence described above and Nivar's own admissions in the Statement of Offense, she knew based on her training and years-long experience in the job that accepting any payment was illegal.  Her actions were full of hubris and blatantly unethical.

DHS plays an important role for the District and its citizens.  It administers a wide range of public assistance programs for the community's impoverished members.  These are individuals who have turned to the government in need of support ranging from health care coverage to food stamps to cash assistance for childcare.  Even though these individuals are some of the most vulnerable members of society in economic straits, Nivar blatantly violated one of the basic tenents

9

of D.C. government employee conduct by violating the obligation that she "not use . . . public office or position for private gain."[7]  The District's Ethics Manual also barred Nivar from "solicit[ing] or accept[ing] any gift or other item of monetary value from any person or entity seeking official action from, doing business with, or conducting activities regulated by the employee's agency, or whose interests may be substantially affected by the performance or nonperformance of the employee's' duties."[8]

This crime was not a momentary lapse in judgment.  Nivar extorted individuals since at least 2018 and into 2023 – she operated solely and then as the mastermind in the conspiracy with Moya, using the information she could have only acquired through her trusted position with DHS.  Indeed, Moya admitted that Nivar induced payment from at least 50 public assistance applicants during the conspiracy; the number of individuals Nivar extorted since 2018 when she operated alone may be far higher.  And for years she reaped material benefits from her criminal conduct.  Nivar's conduct was an unabashed assault on the sort of institution that DHS strives to be, and the sort of institution the District's citizens deserve it to be.  Even though she sometimes processed and approved health care coverage for individuals, she did so in exchange for a fee she knew she was not entitled to receive.  That is serious criminal conduct.  The sentence imposed in this case must reflect the gravity of her offense.  Indeed, the U.S. Probation Office's recommendation that Nivar be sentenced to 28 months of incarceration underscores the seriousness of her conduct and the nature of the conspiracy with Moya.  *See generally* ECF 68.

---

[7]  District Government Employee Ethics Manual, Ethical Obligations of District Government Employees, *available at* https://edpm.dc.gov/issuances/district-government-employee-ethics-manual/ (last visited Apr. 17, 2025).

[8]  *Id.*

## B. The Sentence Imposed Must Afford Adequate Deterrence and Promote Respect for the Rule of Law

The Government recommends that Nivar be sentenced to 27 months of incarceration, which falls within the Guidelines range. The U.S. Probation Office has not identified any basis for the Court to depart from the Guidelines and "has not identified any circumstances that are not adequately considered within the guidelines." PSR ¶ 157. Indeed, The U.S. Probation Office identified "an aggravating factor for an upward variance in this case" – specifically, that "Nivar induced payment from at least 50 public assistance applicants . . . – an amount of victims much greater than the Persons A through I already identified and agreed to in the Statement of Offense." *Id.* ¶ 159.

The sentence in this case must sufficiently dissuade other public officials from engaging in similar conduct. No current or future District employee should think that they can enrich themselves in such a manner without being held accountable and subject to a significant custodial sentence. Given the corrupt nature of the criminal conduct at issue, any sentence that fails to provide adequate general deterrence would likewise fail to promote respect for the rule of law. A guidelines sentence is sufficient, but not greater than necessary, to address the deterrent purposes of sentencing and promote respect for the rule of law. A government employee today looking at the extent of Nivar's misconduct and seeing it addressed through a below-the-Guidelines sentence might very well decide that the reward is worth the risk. That is not deterrence, and that would not promote respect for the rule of law.

It is unlikely that Nivar herself will ever be given another position of public trust in the District. While she may never again be able to corrupt a District agency from the inside, she also should be deterred from participating in future criminal conduct with the D.C. government in any capacity.

### C. The Sentence Imposed Must Avoid Unwarranted Sentencing Disparities

The Government credits Nivar for accepting responsibility prior to trial. But her decision did not come in a vacuum. Nivar pled guilty after learning that her co-conspirator, Moya, had cooperated against her and that the Government was preparing to present a superseding indictment based on additional victims' testimony and evidence. In exchange for Nivar's guilty plea, the Government agreed to cease further investigation, which would have included investigative steps pertaining to additional victims, and accordingly, potentially a greater loss amount. As a result, Nivar's Total Adjusted Offense Level of 17 already reflects a reduction in the sorts of sentences available.

The PSR notes that during the last five fiscal years, there were 80 defendants whose primary guidelines was §2C1.1, with a final offense level of 17 and in Criminal History Category I (after excluding those who received a substantial assistance departure). PSR ¶ 160. Sixty-two of the incarcerated defendants (78%) received an average length of 16 months' imprisonment, and the median length of those terms was fifteen months. *Id*. Nivar's case is distinguishable for numerous reasons. Section 2C1.1 covers numerous types of public corruption offenses. It also includes defendants who were not convicted for abusing their official government position like Nivar did. The average length of imprisonment statistic also sheds no light on the length of the crime or the number of victims impacted. Here, Nivar operated her scheme for a long period of time while she was a public official – at least five years – and her co-conspirator admitted that Nivar had induced payment from at least 50 public assistance applicants. These factors, as well as those described throughout this memo, militate toward a guidelines sentence.

### D. The Defendant's History and Characteristics

The crime to which Nivar pled guilty was not committed by a single act of aberrant conduct. Instead, Nivar extorted low-income individuals seeking public assistance benefits for at least five years (from 2018 to 2023), going so far as to introduce a co-conspirator in 2022 to act as an intermediary in an effort to conceal her scheme from law enforcement. As her co-conspirator admitted, at least since Moya joined the scheme in 2022, Nivar induced payment from at least 50 public assistance applicants to obtain benefits to which they were entitled to apply for free. The number of individuals Nivar extorted from 2018 to 2022 could easily surpass that.

In addition, even though the Government did not seek an Aggravating Role Adjustment pursuant to Section 3B1.1, Nivar's role in the conspiracy is a Section 3553(a) factor that further warrants a sentence above the bottom of her guidelines range. Nivar operated solely since at least 2018 – approximately four years – before Moya joined the scheme in 2022. Particularly given Nivar's role at DHS – which brought with it years of experience of how the public assistance application and approval processes worked and access to sensitive, nonpublic information – she was able to serve as the mastermind of the scheme with Moya. Indeed, Nivar ran the show: she directed individuals to pay Moya and send her the necessary documentation for applications, Nivar accessed information from the internal DHS database for the applications, and she showed Moya how to create materials for the applications. As Moya admitted, the extortion scheme would not have worked without Nivar. ECF 57 ¶ 13.

Finally, even though Nivar has accepted responsibility by pleading guilty, her letter to the Court as part of sentencing suggests that she still lacks remorse for the amount of pain, fear, and distress she inflicted on numerous individuals, particularly given the position of power, authority, and public trust she wielded solely for personal gain.

## IV. RESTITUTION & FORFEITURE

As part of her plea agreement, Nivar has agreed to forfeit $6,975. The Government respectfully requests that the Court order Nivar to pay restitution in the amount of $600 to Victim RG whose name and address will be provided separately to the clerk's office. The $600 reflects the loss amount sustained by this victim (*i.e.*, paid to Nivar) as a result of the conduct described above. Otherwise, the Government is not seeking further forfeiture, restitution, or a fine in this matter.

## V. CONCLUSION

To adequately address the seriousness of Nivar's criminal conduct and sufficiently deter others from corrupting government agencies, the Court should sentence Nivar to a guidelines sentence of 27 months of incarceration, to be followed by two years of supervised release, along with forfeiture in the amount of $6,975, and restitution in the amount of $600 to Victim RG whose information will be provided separately to the clerk's office.

Respectfully submitted,

EDWARD R. MARTIN, JR.
UNITED STATES ATTORNEY

By:   */s/ Madhu Chugh*
MADHU CHUGH
D.C. BAR NO. 992122
Assistant United State Attorney
Fraud, Public Corruption & Civil Rights Section
601 D Street, NW
Washington, D.C. 20530
(202) 252-6718