UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | |
| : | CASE NO. 24-CR-222-2 (JEB) |
| YESSICA MOYA : | |
| : | |
| Defendant. : | |

**UNITED STATES' MOTION FOR A DOWNWARD DEPARTURE
AND MEMORANDUM IN AID OF SENTENCING**

Between late 2022 and May 2023, Yessica Moya and Ruth Nivar actively worked together to extort vulnerable members of society — low-income, non-English speaking immigrants in need of public assistance health care coverage. While Nivar was employed at the D.C. Department of Human Services, she charged victims a fee to help them apply for and receive health care coverage even though those were some of the very duties she was required to provide as part of her job. Nivar began her extortion scheme in 2018. Moya—who has five prior convictions—teamed up with Nivar in 2022. Together, they unlawfully extracted money from at least 50 clients. In May 2024, a grand jury charged them with conspiracy and Hobbs Act Extortion. One month before their trial was scheduled to begin, Moya debriefed with the government and pled guilty pursuant to a cooperation agreement, which prompted Nivar to immediately plead guilty too. The Court sentenced Nivar to 24 months' imprisonment. Based on the substantial assistance that Moya provided, the United States requests that her final offense level be reduced from 13 to 9 pursuant to USSG § 5K1.1, which would result in a final guidelines range of 8 to 14 months. Consistent with that Guideline and the 18 U.S.C. § 3553(a) factors, the Court should sentence Moya to six months of imprisonment followed by two years of supervised release with the first six months being served on home detention.

1

**FACTUAL BACKGROUND**

I.     **MOYA'S HISTORY AND CHARACTERISTICS**

   A.     **Upbringing, Children, and Residence**

Moya was born in the Dominican Republic, where she was raised by loving parents in a low-crime neighborhood. *See* PSR ¶ 89, 91. Unlike many of the defendants who appear at this courthouse, her upbringing did not include any abuse, financial hardships, or traumatic events. PSR ¶ 91. She is a United States citizen.

Moya has four children ages 6, 9, 12, and 16. PSR ¶ 93-94. Person-1, with whom she was in a relationship from 2012 through 2021, is the father of the 6-year-old and 9-year-old. Moya also reportedly has custody of two of Person-1's children that he had with a former partner. Those kids are ages 12 and 16. *See* PSR ¶ 94. Moya's children reside with her in a three-story residence in Washington, D.C., which she and Person-1 have owned for seven years. PSR ¶ 94.

The PSR writer conducted a home assessment of Moya's residence in April 2025. Moya and her 16-year-old son were home. PSR ¶ 96. During the assessment, Moya refused to open one of the doors in the basement. She indicated that someone lived there but would not provide any information about that person. PSR ¶ 96.

   B.     **Education and Employment**

Moya graduated from Roosevelt High School in Washington, D.C, in 2009. She continued her education first at the University of the District of Columbia and then at Howard Community College, where she took nail technician courses. PSR ¶ 107. She is a licensed Cosmetology Specialist Operator – Manicurist.  *See* PSR ¶ 107.

Indeed, Moya has earned money in the cosmetology field. At the time that the PSR was drafted, she had been working part-time as a nail technician at a store in Arlington earning

approximately $600 biweekly plus tips. PSR ¶ 110. She also told the PSR writer that from 2021 through 2024 she was self-employed doing nails, advertising her services on Instagram. PSR ¶ 111. It appears that she continues to offer these services through the beauty salon in the basement of her home. PSR ¶ 96. A review of her business' public Facebook and Instagram accounts included June 3, 2025, posts inviting women to direct message her about booking appointments. *See* https://www.facebook.com/yessibglamnails and https://www.instagram.com/yessibglamnails (both last visited June 17, 2025). Customers also can directly book services through her website. *See* https://yessi-b-glam-nails.square.site (last visited June 17, 2025).

Moya's employment history includes a full-time receptionist position from 2016 through 2017 at a title company. She was terminated from that position because of the outcome of her background check. PSR ¶ 112.

    **C.**    **Criminal History**

In addition to the instant offense, Moya's criminal history includes multiple theft convictions, including felonies, and apparently entirely probationary sentences that were never revoked even though she continued to engage in criminal conduct while on probation.

In 2013, when she was 24, Moya was arrested and convicted of one count of conspiracy to commit grand larceny and two counts of grand larceny in Loudoun County, Virginia, which appear related to stealing an air conditioning unit and drill from a Home Depot and more than a thousand dollars' worth of children's clothing and toys from a Babies "R" Us. In the Home Depot incident, Moya served as a lookout for her male associate who walked out of the store without paying for a $319 air conditioning unit and a power drill; Moya had placed the drill in the shopping cart. After a loss prevention officer contacted police and provided information about the vehicle that the suspects left in—a gold Dodge Caravan with D.C. tags—police successfully located the minivan

nearby and initiated a traffic stop. The air conditioning unit, drill, and merchandise that had been stolen from a Babies "R" Us store earlier that day were all recovered from the minivan. The Babies "R" Us merchandise included Carter's-branded clothing. Moya was sentenced to a total of six years of imprisonment, but all the time was suspended, and she was placed on three years of probation. PSR ¶ 73. Her probation was closed successfully in November 2016 notwithstanding a March 2015 arrest and November 2015 conviction once again for Grand Larceny, this time in Fairfax, Virginia. PSR ¶ 74.

The 2015 Fairfax larceny case involved Moya and two other individuals stealing thousands of dollars in clothing and cosmetics. The clothing, which had store tags attached, was in the rear cargo area of an Acura MDX that was registered to Person-1, i.e., the father of two of Moya's children and co-owner of her residence. *See* PSR ¶ 74, 94-95. When police approached Moya, she was holding a Louis Vuitton purse that contained four separate cosmetic items that she had stolen from the store. Police recovered an additional $200 in stolen cosmetics from the back seat of the Acura near where Moya had been sitting. The car also had more than $2,000 worth of other items, including Carter's and Babies "R" Us clothing. Despite being on probation for conspiracy to commit grand larceny and grand larceny when she committed the 2015 offense, in November 2015, Moya was sentenced to two years of imprisonment, with the entire sentence being suspended, and placed on two years of supervised probation. In March 2017, she filed a petition to have her probation terminated early, which was granted.

In July 2017, four months after her petition was granted and four months before her Fairfax County probation would have otherwise terminated, she was arrested in Howard County, Maryland, for misdemeanor theft. After pleading guilty, she was sentenced to 90 days of

imprisonment, but as with her prior sentences, the entire time was suspended. PSR ¶ 75. Her probation expired in November 2018.

In July 2022, she was arrested once again for theft, this time in Montgomery County, Maryland. After pleading guilty, she was fined. PSR ¶ 76.

No later than November 2022, she started conspiring with Nivar to extort vulnerable victims in the instant case.

In August 2023, she was arrested for misdemeanor theft in Montgomery County, Maryland. In October 2023, after pleading guilty, she once again received a sentence of confinement that was entirely suspended and placed on two years of supervised probation. PSR ¶ 77.

She had multiple other theft-related arrests in 2009, 2012, 2020, 2022, and 2023. PSR ¶ 81-85.

## II.  THE EXTORTION SCHEME

### A.  Nivar's Employment & Origin of Scheme

Nivar was employed by the D.C. Department of Human Services ("DHS") as a Social Services Representative ("SSR")[1] from July 2005 until June 2023. PSR ¶ 16; ECF 60 ¶ 1. DHS administers programs that support low-income individuals and families. PSR ¶ 17-19. Nivar's job responsibilities included helping such individuals complete and/or process applications for public assistance programs. PSR ¶ 20. The District of Columbia government does not charge applicants a fee to apply for public assistance programs. PSR ¶ 21. Moreover, Nivar was not

---

[1] On October 1, 2022, Nivar began a one-year detail assignment to the D.C. Department of Health Care Finance but maintained her position as an SSR.

5

permitted by DHS to charge or collect a personal fee to complete or process applications; it was part of her job responsibilities to do so free of charge. PSR ¶ 20.

Since at least 2018, Nivar illegally charged applicants a fee to complete and/or process applications with applicants paying the unlawful fee directly to Nivar. PSR ¶ 52; ECF No. 60 ¶ 8-9.

### B. Moya Joins the Extortion Scheme

At some point in 2022, after Nivar realized that law enforcement may have become aware of her extortion scheme, she teamed up with Moya, whom she had known for more than twenty years, so Moya could assist in the scheme. *See* PSR ¶ 23. At some point, Moya was aware that Nivar wanted to hide the scheme from law enforcement. PSR ¶ 23. Moya also was aware that the D.C. government does not charge applicants a fee to apply for or process applications for public assistance programs. She knew this in part because she had personally obtained public assistance benefits from the D.C. government without being charged a fee. PSR ¶ 21.

After they agreed to work together, Nivar gave individuals seeking help with their public assistance applications Moya's contact information and told them to pay Moya to obtain the benefits. Moya would then split the money evenly with Nivar. PSR ¶ 24. Before Moya joined the scheme, Nivar charged applicants $150 per application. Once the two women teamed up, they charged new applicants $200 and induced payment from at least 50 applicants. PSR ¶ 25, 49.

### III. PROCEDURAL HISTORY

In May 2024, the grand jury returned an indictment charging Moya with one count of Conspiracy to Commit Hobbs Act Extortion Under Color of Official Right and two counts of Aiding and Abetting Hobbs Act Extortion Under Color of Official Right. Nivar was charged with those three offenses and four additional substantive extortion counts.

Moya was initially required to wear a GPS ankle monitor as a condition of her pretrial release, but that condition was lifted 2.5 months after her initial appearance. *See* ECF No. 33. Notably, Moya provided the Court with information that the GPS monitor prevented her from entering the water with her child during therapeutic swim lessons. *See* ECF No. 27.

Trial was scheduled to commence on February 3, 2025. In December 2024 and January 2025, the Government prepared to present a superseding indictment to add extortion charges based on testimony and other evidence involving additional extortion victims.

A month before trial, Moya started cooperating with the government. On January 2, 2025, she participated in a debriefing interview that lasted several hours at the U.S. Attorney's Office. Six days later, she appeared before this Court and pled guilty to two counts in the indictment.

On January 13, 2025, after learning of Moya's guilty plea, Nivar pled guilty too.

On April 25, 2025, this Court sentenced Nivar to 24 months of incarceration.

## IV.    SENTENCING GUIDELINES

The parties and the presentence investigation report writer agree that the following guidelines apply.

| | | |
|---|---|---|
| USSG § 2C1.1(a)(2) | Base Offense Level | 12 |
| USSG § 2C.1.1(b)(1) | Specific Offense Characteristic: More than one extortion | 2 |
| USSG § 2C.1.1(b)(2) / 2B1.1(b)(1)(A) | Loss Amount: less than $6,500 | 0 |
| USSG § 3A1.1(b)(1) | Vulnerable Victim | 2 |
| USSG § 3E1.1 | Acceptance of Responsibility | -3 |
| | Total: | 13 |

PSR ¶ 56-71.

    Moya has the following scoreable convictions:

- Conspiracy to Commit Grand Larceny, Grand Larceny (x2) – 2013 (1 Point)
- Grand Larceny – 2015 (1 Point)
- Misdemeanor Theft – 2017 (1 Point)
- Misdemeanor Theft – 2022 (1 Point)
- Misdemeanor Theft – 2023 (1 Point).

PSR ¶ 73-77. Pursuant to USSG § 4A1.1(c), those sentences result in a maximum of four points, resulting in a criminal history category of III. PSR ¶ 78-79. With an offense score of 13 and a criminal history of Category III, the recommended guidelines range before any substantial assistance downward departure is 18 to 24 months of incarceration.

## V. DOWNWARD DEPARTURE UNDER SECTION 5K1.1 OF THE GUIDELINES

    The United States seeks a downward departure under Section 5K1.1 of the Guidelines based on Moya's substantial assistance in the prosecution of Nivar. Although Moya did not start cooperating until the case was approaching trial, her cooperation was invaluable. She spent hours debriefing with the United States Attorney's Office and two FBI agents on January 2, 2025. She also gave consent for law enforcement to search her phone and voluntarily identified useful evidence that might be on her phone and messaging applications. She detailed information about the extortion scheme, including how she became involved, and her role in the scheme. She also was willing to testify at any hearing as needed by the government. Ultimately, her testimony was not necessary because two days after Moya pleaded guilty, Nivar signed plea paperwork to resolve her case without a trial. There is no doubt that Moya's decision to cooperate with the government was consequential with respect to Nivar's decision to plead guilty. As a result, Moya helped the government save time and resources.

As a result of her cooperation, the United States recommends a four-level departure from offense level 13 to offense level 9, which would result in a recommended range of 8 to 14 months, which is in Zone B of the Sentencing able. The Guidelines note that a sentence of probation is authorized—though not required—in Zone B if a court imposes a condition or combination of conditions requiring a period of community confinement, home detention, or intermittent confinement sufficient to satisfy the minimum term of imprisonment specified in the guideline range. *See* USSG § 5B1.1(a)(2). The recommended fine at offense level 9 is $2,000 to $20,000. USSG § 5E1.2.

## VI. THE 18 U.S.C. § 3553(a) FACTORS SUPPORT INCARCERATION

The Court must impose a sentence that is sufficient but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational treatment. 18 U.S.C. § 3553(a)(2). The Court also must consider the history and characteristics of the defendant, the kinds of sentences available, the sentencing range under the guidelines, any relevant policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to the victims. 18 U.S.C. § 3553(a)(1)-(7).

The section 3553(a) factors support a sentence that includes a significant period of incarceration, yet one that is substantially lower than Nivar's 24-month sentence.

### A. The Nature and Circumstances of the Offense and the Need for the Sentence to Reflect the Seriousness of the Offense

Moya and Nivar exploited impoverished non-English speaking individuals who lacked the resources to navigate what can be the complicated process of obtaining health care coverage from

9

the government. Nivar abused her position within the D.C. government and extorted people for a much longer period than Moya did. However, Moya readily participated in the scheme starting no later than November 2022 and continuing through May 2023. Moreover, her involvement was far from passive. She created online accounts, accepted Zelle and cash payments from victims, kicked back money to Nivar, regularly went to Nivar's house to complete applications, and communicated with Nivar over WhatsApp about the scheme. As someone who personally obtained public assistance benefits from the D.C. government, Moya knew that applicants did not need to pay a fee, yet she actively worked with Nivar to extort the victims anyway. Her conduct was serious and warrants a significant period of imprisonment.

> **B. The Need to Promote Respect for the Law and to Deter the Defendant and Others from This Type of Criminal Conduct**

Absent Moya's cooperation, the government would ask for a substantially higher sentence. She clearly was not deterred from engaging in criminal conduct after receiving a probationary sentence following her 2013 convictions for conspiracy to commit grand larceny and substantive grand larceny. She clearly was not deterred when she received yet another probationary sentence in 2015 following another larceny conviction. She also was not deterred from the non-custodial sentences she received in July 2017 or November 2022. Unfortunately, there is no reason to believe she will be deterred from engaging in additional criminal conduct if she receives a non-custodial sentence in this case. Moreover, a sentence that includes six months' incarceration followed by six months of home detention will send a message to would-be Moyas that there will be severe consequences for repeatedly helping a D.C. government official extort vulnerable members of the population.

### C. The History and Circumstances of the Defendant

Moya's history and circumstances are complicated. She enjoyed a childhood devoid of abuse, financial hardship, and traumatic events, but found herself in a physically and mentally abusive romantic relationship in her 20s. She is raising six children and operating her own business yet has not allowed being a mother—and thus a role model for her children—to stop her from repeatedly engaging in criminal conduct. She has been given a staggering number of chances by judges to stay out of jail but shown no willingness to refrain from committing crime. Absent her cooperation, an 18-month sentence would be appropriate. But such a sentence would overlook the substantial assistance that Moya provided in getting Nivar to plead guilty and steps that she has taken to atone for the conduct in this case. Taken as a whole, her history and circumstances warrant a six-month prison sentence followed by six months of home detention.

### D. Unwarranted Sentencing Disparities

The District of Columbia Circuit has recognized that there will "inevitably . . . [be] sentencing disparities and inequities that can be explained by little more than the identities of the sentencing judges." *United States v. Gardellini*, 545 F.3d 1089, 1096 (D.C. Cir. 2008); *see also United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006) ("[W]ith different judges sentencing two defendants quite differently, there is no more reason to think that the first one was right than the second."). The Guidelines "reduce unwarranted federal sentencing disparities," *Freeman v. United States*, 564 U.S. 522, 525 (2011), by "creat[ing] a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences." *Id.* at 533.

A sentencing court "necessarily g[ives] significant weight and consideration to the need to avoid unwarranted disparities" by "correctly calculat[ing] and carefully review[ing] the Guidelines

11

range." *Gall v. United States*, 552 U.S. 38, 54 (2007). "[I]mposing a within-guidelines sentence is the surest way to avoid unwarranted disparities." *United States v. White*, 737 F.3d 1121, 1145 (7th Cir. 2013).

The government's recommended sentence for Moya would not lead to an unwarranted sentencing disparity with the sentence imposed against Nivar. Without question, Nivar was more culpable given that her extortion scheme extended for a much longer period and involved her abusing her position within the D.C. government to extort vulnerable victims. Moya was a non-government insider, participated in the scheme for a much shorter period, and cooperated with the government; accordingly, she demands a much more lenient sentence. However, those factors are reflected in the recommended four-level departure, the final recommended guidelines range, and the government's sentencing recommendation.[2]

## VII.   RESTITUTION AND FORFEITURE

As part of her plea agreement, Moya agreed to the entry of a forfeiture money judgment in the amount of between $4,000 and $6,500. The United States requests that the Court grant the government's motion for an unopposed motion for entry of a $4,000 forfeiture money judgment order (ECF No. 84), issue the order (ECF No. 84-1), reference the order at sentencing, and include the order in the judgment.

---

[2] The United States is sympathetic to Moya's parenting responsibilities. As a result, it does not oppose a delayed self-surrender date to allow Ms. Moya to make necessary preparations to ensure that her children will receive proper care if the Court follows the government's recommended six-month prison sentence. It also does not oppose the recommended home detention component of the sentence following her release from prison including exceptions for appointments, events, and school-related activities regarding her children. It also does not oppose a non-GPS form of location monitoring, which would allow her to still attend therapeutic swimming classes with her son without worrying about a GPS monitor being attached to her body.

The United States also requests that the Court order Moya to pay restitution in the amount of $250 to Victim RG whose name and address will be provided separately to the clerk's office. The $250 reflects the loss amount sustained by this victim (*i.e.*, paid to Moya) as a result of the criminal conduct described above.

## **CONCLUSION**

The United States respectfully requests that the Court sentence Yessica Moya to 6 months of imprisonment followed by two years of supervised release with the first six months to be served on home detention.

Respectfully submitted,

JEANINE FERRIS PIRRO
U.S. Attorney

By: */s/ Kondi J. Kleinman*
Kondi Kleinman, Cal. Bar No. 241277
Assistant United States Attorney
United States Attorney's Office
601 D Street N.W. | Washington, D.C. 20530
(202) 252-6887 | kondi.kleinman2@usdoj.gov